UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SANAYI BECKLES-CANTON,

                          Plaintiff,

               -v.-

LUTHERAN SOCIAL SERVICES OF NEW
YORK, INC.,

                          Defendant.

---

20 Civ. 4379 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Sanayi Beckles-Canton brings this action against her former
employer, Defendant Lutheran Social Services of New York, Inc., alleging a
violation of the anti-retaliation provision of the False Claims Act (the "FCA"), 31
U.S.C. § 3730(h).  Specifically, Plaintiff alleges that she was terminated in
retaliation for her internal and external reporting of Defendant's
misappropriation and misuse of funds received from Head Start, a program
administered by the U.S. Department of Health and Human Services ("HHS").
Defendant has moved to dismiss the Complaint under Federal Rule of Civil
Procedure 12(b)(6).  For the reasons set forth below, the Court denies
Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

Defendant, a not-for-profit corporation located in New York (Compl. ¶ 7),

operates a faith-based agency that provides community services to individuals

---

[1]    The facts in this Opinion are drawn from Plaintiff's Complaint ("Compl." (Dkt. #1)),
       which is the operative pleading in this action.  The Court accepts as true the well-

seeking assistance with food, shelter, education, and other needs-based services in New York City (*id.* at ¶ 8).  As relevant to this action, Defendant maintains a number of early childhood education centers for low-income children under the age of mandatory school attendance.  (*Id.* at ¶ 9).  Head Start, administered under the auspices of HHS, provides the primary source of federal funding for these education centers.  (*Id.*).  As a recipient of federal funds, Defendant is required to comply with certain federal regulations mandating proper fiscal control and certain accounting procedures to ensure that expenditures reimbursed by federal funds are: (i) authorized in advance; (ii) made only for eligible expenditures; and (iii) accurately reported.  (*Id.* at ¶ 10 (citing 34 C.F.R. §§ 80.20, 80.21)).

Plaintiff was hired as Defendant's Director of Family Services on August 1, 2016.  (Compl. ¶ 11).  In that role, Plaintiff was responsible for overseeing Defendant's education centers in Brooklyn, the Bronx, and Manhattan.  (*Id.*).  Plaintiff's job responsibilities included, *inter alia*: (i) hiring Family Services Coordinators ("FSCs"), and training and coaching FSCs regarding the Head Start Family Service model and program requirements; (ii) ensuring that FSCs maintained organized records; (iii) reviewing and tracking individualized Family Partnership Agreements; (iv) monitoring FSCs'

---

pleaded allegations of Plaintiff's Complaint for purposes of this motion.  For ease of reference, the Court refers to Defendant's opening brief as "Def. Br." (Dkt. #18); Plaintiff's opposing brief as "Pl. Opp." (Dkt. #21); and Defendant's reply brief as "Def. Reply" (Dkt. #24).

files and workloads; (v) submitting accurate and timely reports; and (vi) regularly visiting Defendant's education centers.  (*Id.* at ¶ 12).

Plaintiff alleges that in May 2017, in the course of her review of certain records prepared by FSCs, she discovered that Defendant was backdating receipts for purchases of children's educational supplies in order to fully expend its budget with Head Start.  (Compl. ¶¶ 13-14).  These purchases were made primarily at Lakeshore, a supply store that specialized in learning products and teaching resources.  (*Id.* at ¶ 14).  Through investigation, Plaintiff came to believe that Defendant was engaged in "fraudulent and wasteful spending" designed to prevent Head Start from decreasing Defendant's budget for the next fiscal year, as the budget was determined by the prior year's expenditures.  (*Id.*).  According to Plaintiff, to avoid scrutiny of its high-volume spending, Defendant had Lakeshore backdate its receipts to indicate that the purchases had occurred in earlier months.  (*Id.* at ¶ 15).  Plaintiff also discovered that Defendant was charging $200 admission fees for its summer program at the direction of its Executive Director, Khamele McCleod-Cato.  (*Id.* at ¶ 16).  Because this program was funded by Head Start, it was required to be administered "free of charge."  (*Id.*).

Later that month, Plaintiff informed Damyn Kelly, Defendant's President and Chief Executive Officer, that she was aware that Defendant had engaged in "misappropriation and misuse" of federal funds.  (Compl. ¶ 17).  Plaintiff alleges that while Kelly told her that he would investigate the alleged incidents, he in fact disregarded her complaints.  (*Id.* at ¶ 18).  What is more, at a weekly

leadership meeting in or around June 2017, McCleod-Cato told Plaintiff: "I know that you spoke to Kelly about the violations, but he told me that nothing was going to be done." (*Id.* at ¶ 19).  When Plaintiff responded that "we have to take steps to pass federal regulations," McCleod-Cato stated that she would "take care of it." (*Id.*).

In August 2017, Plaintiff met with Kelly for a second time and again raised the "spending issues involving Head Start funds." (Compl. ¶ 20).  Kelly responded that he would investigate Plaintiff's allegations, but encouraged her to "be a team player" and to "keep things internal." (*Id.*).  Again, Plaintiff was subsequently criticized by McCleod-Cato for complaining directly to Kelly, this time being told that she had "no authority" to do so. (*Id.* at ¶ 21).  Plaintiff alleges that, after the two meetings with Kelly, her relationship with McCleod-Cato deteriorated to the point that McCleod-Cato openly criticized Plaintiff and otherwise "acted cold and hostile towards her." (*Id.*).

In late August 2017, Plaintiff requested a meeting with Kelly to discuss McCleod-Cato's hostility and to express concerns that she was experiencing retaliation for her internal reporting. (Compl. ¶ 21).  Kelly met with Plaintiff the following month and encouraged her to identify "other ways of working with the situation and dealing with McCleod-Cato." (*Id.* at ¶ 22).  Even after this meeting, Kelly failed to take any steps to address McCleod-Cato's conduct. (*Id.*).  Moreover, in late November 2017, Plaintiff learned that Defendant was continuing its practice of backdating receipts. (*Id.* at ¶ 23).  Consequently, Plaintiff submitted a written complaint to Head Start reporting both

Defendant's backdating of receipts as well as its practice of charging students to attend the Head Start summer program.  (*Id.*).

On February 5, 2018, McCleod-Cato terminated Plaintiff's employment, ostensibly for "serious misconduct" in which Plaintiff had allegedly engaged while at a December 2017 Parent Leader conference in Austin, Texas.  (Compl. ¶¶ 24, 27-29).  Plaintiff had attended the annual conference with Defendant's Director of Program Governance and a student's parent invited by the Director. (*Id.* at ¶ 25).  Plaintiff's termination letter claimed that she had falsified car service receipts and had either submitted or assisted the parent in submitting the fraudulent receipts.  (*Id.* at ¶ 28).  Additionally, McCleod-Cato indicated that Plaintiff had been terminated for mishandling Defendant's funds, including for "treating" the parent to a dinner on the trip costing $130.99.  (*Id.* at ¶ 29).  Plaintiff contends that she submitted her own receipts following the conference and had no knowledge of the contents of the parent's receipts, as the parent's attendance was the responsibility of the Director of Program Governance.  (*Id.* at ¶ 30).  Despite this, the Director of Program Governance faced "zero disciplinary action" for the parent's conduct.  (*Id.* at ¶ 31).

## B.    Procedural Background

On June 8, 2020, Plaintiff initiated this action with the filing of her Complaint.  (Dkt. #1).  On August 17, 2020, Defendant filed a letter requesting a conference regarding its anticipated motion to dismiss Plaintiff's Complaint (Dkt. #12), and Plaintiff filed a letter in opposition on August 21, 2020 (Dkt. #13).  On August 21, 2020, the Court issued a memorandum endorsement

5

indicating it did not believe a pre-motion conference was necessary and setting a briefing schedule on Defendant's motion.  (Dkt. #14).  Defendant filed the instant motion to dismiss on September 25, 2020 (Dkt. #17-18); Plaintiff filed her opposition submission on November 6, 2020 (Dkt. #21); and Defendant filed its reply submission and request for oral argument on December 4, 2020 (Dkt. #24, 25).[2]

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In considering the motion, a court must "draw all reasonable inferences in Plaintiffs' favor" and "assume all well-pleaded factual allegations to be true."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).

---

[2]     Although the Court appreciated Defendant's willingness to appear for oral argument, it determined that oral argument was not necessary to resolve the instant motion.

Notwithstanding, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007)).

### 2.   Retaliation Under the FCA

The FCA, 31 U.S.C. §§ 3729-3733, a federal statute "originally aimed … at stopping the massive frauds perpetrated by large contractors during the Civil War," *Universal Health Servs., Inc.* v. *United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016), "imposes significant penalties on those who defraud the Government," *id.* at 1995.  And although "Congress has repeatedly amended the Act, … its focus remains on those who present or directly induce the submission of false or fraudulent claims."  *Id.* at 1996.

The "whistleblower" provision of the FCA, 31 U.S.C. § 3730(h), was intended to protect persons who assist in the discovery and prosecution of fraud who otherwise would not come forward for fear of termination,

harassment, or other forms of retaliation.  *See Faldetta* v. *Lockheed Martin Corp.*, No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *11 (S.D.N.Y. Nov. 9, 2000); *see also Swanson* v. *Battery Park City Auth.,* No. 15 Civ. 6938 (JPO), 2016 WL 3198309, at *2 (S.D.N.Y. June 8, 2016).  It provides in relevant part:

> [a]ny employee … shall be entitled to all relief necessary to make that employee … whole, if that employee … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).  In order to plead a claim of retaliation under the FCA, a plaintiff is generally required to show that (i) "[s]he engaged in activity protected under the statute"; (ii) "the employer was aware of such activity"; and (iii) "the employer took adverse action against [her] because [s]he engaged in the protected activity."  *United States ex rel. Chorches for Bankr. Est. of Fabula* v. *Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017).[3]  Significantly, a

---

[3]    Plaintiff argues that she is not required to plead a *prima facie* case at this stage of the litigation, but need only "allege minimal factual support for the proposition that [her] employer was motivated by discriminatory, or retaliatory, intent." (Pl. Opp. 7-8).  In support, Plaintiff proffers a number of cases that do not pertain to the FCA, let alone a retaliation claim brought pursuant to the FCA.  *See Littlejohn* v. *City of New York*, 795 F.3d 297, 310-11 (2d Cir. 2015) (Title VII of the Civil Rights Act of 1964 claim); *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89-91 (2d Cir. 2015) (same); *EEOC.* v. *Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (Equal Pay Act claim); *Balko* v. *Ukrainian Nat'l Fed. Credit Union*, No. 13 Civ. 1333 (LAK) (AJP), 2014 WL 1377580, at *10-11 (S.D.N.Y. Mar. 28, 2014) (Federal Credit Union Act claim), *report and recommendation adopted*, No. 13 Civ. 1333 (LAK), 2014 WL 12543813 (S.D.N.Y. June 10, 2014).  The Court understands that sister courts within this District continue to require plaintiffs to allege each element of an FCA retaliation claim to survive a motion to dismiss.  *See, e.g.*, *Lawrence* v. *Int'l Bus. Mach. Corp.*, No. 12 Civ. 8433 (DLC), 2017 WL 3278917, at *8-9 (S.D.N.Y. Aug. 1, 2017) (dismissing FCA retaliation claims for failure to allege protected activity, notice, and but-for causation); *cf. Swanson* v. *Battery Park City Auth.*, No. 15 Civ. 6938 (JPO), 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) (discussing the same pleading requirements with respect to the New York

plaintiff "need not plead an FCA retaliation claim with particularity because no showing of fraud is required." *United States ex rel. O'Toole* v. *Cmty. Living Corp.*, No. 17 Civ. 4007 (KPF), 2020 WL 2512099, at *11 (S.D.N.Y. May 14, 2020) (internal quotation marks omitted) (quoting *United States* v. *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 (E.D.N.Y. 2016)).

## B.   Analysis

Defendant argues that Plaintiff has failed to plead each of the required elements of a retaliation claim under § 3730(h).  Specifically, Defendant asserts that Plaintiff has failed to allege that: (i) she engaged in "protected activity" under the FCA (Def. Br. 6-14); (ii) Defendant was on notice of any such protected activity (*id.* at 14-15; Def. Reply 2-7); and (iii) she was terminated by Defendant because of her alleged protected conduct (Def. Br. 15-19).  The Court will address each of Defendant's proffered bases for dismissal, but to preview, it finds that Plaintiff has alleged a viable retaliation claim.

### 1.   Plaintiff Has Alleged Protected Activity

As stated above, to satisfy the first element of her retaliation claim, Plaintiff must allege that she engaged in conduct protected under the FCA. *Chorches*, 865 F.3d at 95.  Protected conduct under the FCA encompasses: "[i] lawful acts done by the employee … in furtherance of an action under the FCA, and [ii] other efforts to stop one or more violations of the FCA." *New York ex rel. Khurana* v. *Spherion Corp.*, No. 15 Civ. 6605 (JMF), 2021 WL 50890, at

_____

False Claims Act).  That said, under either pleading standard, Plaintiff's claim withstands Rule 12(b)(6) scrutiny.

*11 (S.D.N.Y. Jan. 6, 2021) (citation and internal quotation marks omitted).  As relevant here, "an employee's activities may be protected even where an FCA suit has not been filed."  *Faldetta*, 2000 WL 1682759, at *12.  While protected activity is "interpreted broadly," an "employee's purpose must not be detached from the [FCA] in order for the employee to receive the FCA's whistle blower protections."  *Garcia* v. *Aspira of New York, Inc.*, No. 07 Civ. 5600 (PKC), 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) (alteration in *Garcia*) (quoting *Luckev* v. *Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1051 (N.D. Ill. 1998)).

Generally, for an employee's conduct to be "in furtherance of an action under the FCA," she "must have been investigating matters that were calculated, or reasonably could have [led], to a viable FCA action."  *Garcia*, 2011 WL 1458155, at *4 (quoting *Faldetta*, 2000 WL 1682759, at *12 (internal quotation marks omitted)).  While "it is not necessary for the plaintiff actually to file a *qui tam* lawsuit, or even to know that the investigation could lead to such a suit," *Fisch* v. *New Heights Acad. Charter Sch.*, No. 12 Civ. 2033 (DLC), 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (internal quotation marks omitted) (quoting *Shekoyan* v. *Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005)), her investigation must be "directed at exposing a fraud upon the government."  *Id.* (internal quotation marks omitted) (quoting *Moor-Jankowski* v. *Bd. of Trs. of N.Y. Univ.*, No. 96 Civ. 5997 (JFK), 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998)).  However, "even if the employee's actions were not necessarily in furtherance of an FCA claim," a retaliation claim can be stated "so long as the employee was engaged in efforts to stop an FCA violation[.]"  *Swanson*, 2016

10

WL 3198309, at *3 (internal quotation marks omitted) (quoting *Malanga* v. *N.Y. Univ. Langone Med. Ctr.*, No. 14 Civ. 9681, 2015 WL 7019819, at *3 (S.D.N.Y. Nov. 12, 2015) ("*Malanga I*")).

Moreover, "a plaintiff is required to show a good faith basis, or objectively reasonable basis, for believing that he or she was investigating matters in support of a viable FCA case." *Swanson*, 2016 WL 3198309, at *3 (internal quotation marks omitted) (quoting *United States ex rel. Sasaki* v. *N.Y. Univ. Med. Ctr.*, No. 05 Civ. 6163 (LMM) (HBP), 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012), *aff'd sub nom. ABC* v. *NYU Hosps. Ctr.*, 629 F. App'x 46 (2d Cir. 2015) (summary order)). Thus, to determine whether an employee engaged in "protected activity," a court must evaluate whether "[i] the employee in good faith believes, and [ii] a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Ortiz* v. *Todres & Co.*, No. 15 Civ. 1506 (LGS), 2019 WL 1207856, at *4 (S.D.N.Y. Mar. 14, 2019) (internal quotation marks omitted) (quoting *Lawrence* v. *Int'l Bus. Mach. Corp.*, No. 12 Civ. 8433 (DLC), 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017)); *see also Koshy* v. *Regeneron Pharm., Inc.*, No. 17 Civ. 7781 (VB), 2019 WL 6895563, at *5 (S.D.N.Y. Dec. 18, 2019).

Defendant argues that Plaintiff's internal complaints were merely a part of her job responsibilities and motivated by a desire to ensure that Defendant would "pass federal regulations." (Def. Br. 7-11 (quoting Compl. ¶ 19)). As such, Defendant submits that Plaintiff's internal reporting was not "directed" at exposing a fraud upon the government, and did not constitute protected

activity.  (*Id.*).  With particular respect to Plaintiff's investigation and reporting

of Defendant's alleged $200 admission charges for Head Start summer

programming, Defendant argues that its summer program charges did not

constitute fraud on the government.  (*Id.* at 11-12).  Lastly, Defendant argues

that Plaintiff's allegations regarding its "fraudulent and wasteful spending" are

conclusory and insufficiently pleaded.  (*Id.* at 12-14).  The Court is

unpersuaded by these arguments, and finds that Plaintiff has sufficiently

pleaded that she engaged in protected activity under the FCA.

    *First*, Plaintiff's actions were not a "mere investigation of [her] employer's

failure to comply with federal regulations," but rather "were directed at

exposing fraud upon the government."  *Fisch*, 2012 WL 4049959, at *5

(internal quotation marks omitted) (quoting *Moor-Jankowski*, 1998 WL 474084,

at *10).[4]  Although Plaintiff acknowledges that she discovered Defendant's

---

[4]    With respect to Defendant's argument that Plaintiff was merely engaged in conduct that
fell within her job description, Plaintiff submits that Defendant is conflating the
"protected activity" and "notice" elements of an FCA retaliation claim.  (Pl. Opp. 11 n.1).
Defendant responds by referring the Court to cases in which courts have considered
whether conduct falls within the scope of an employee's job responsibilities in
determining whether it constitutes protected activity.  (Def. Reply 2-3).  *See Lawrence*,
2017 WL 3278917, at *9 (finding that plaintiff's reporting of concerns about his
employer's internal controls was not protected activity given that, as an internal
auditor, the "identification of weaknesses in internal controls was part and parcel of his
job responsibilities"); *Faldetta*, 2000 WL 1682759, at *12 (concluding that plaintiff did
not participate in protected activity where he "engaged in conduct that ordinarily falls
within the context of his job responsibilities").  However, other courts have rejected
similar arguments in conducting the "protected activity" inquiry.  *See, e.g.*, *Fisch* v. *New
Heights Acad. Charter Sch.*, No. 12 Civ. 2033 (DLC), 2012 WL 4049959, at *5-6
(S.D.N.Y. Sept. 13, 2012) (finding that, despite defendant's argument that plaintiff was
"simply acting in his capacity as [Chief Operating Officer]," plaintiff had engaged in
protected activity where he had "investigat[ed] matters that were calculated, or
reasonably could lead, to a viable FCA action" (quoting *Shekoyan* v. *Sibley Int'l*, 409
F.3d 414, 423 (D.C. Cir. 2005))).  In any event, as the Court will discuss further when it
turns to the "notice" element, accepting Plaintiff's allegations as true, it is unable to
conclude from the pleadings that her alleged protected activity fell within the scope of
her job responsibilities.

backdating of receipts "while performing her job duties," her investigation did not cease with this review of her supervisees' records.  (*See* Compl. ¶¶ 13-14). Plaintiff investigated further, and upon discovering the purpose of the backdating as well as the prohibited charges for the Head Start summer program, reported her findings to Kelly, Defendant's President and Chief Executive Officer.  (*Id.* at ¶¶ 14-17).  Specifically, Plaintiff informed Kelly of "her knowledge of [Defendant's] misappropriation and misuses of certain funds that Defendant received from the government."  (*Id.* at ¶ 17).  *See Garcia*, 2011 WL 1458155, at *4 (finding that plaintiff engaged in protected activity where, *inter alia*, he "raised the issue of 'the company's misuse of government funds'" at a meeting with defendant's executive director and chief financial officer).  One month later, Plaintiff was told by McCleod-Cato first that "nothing was going to be done" by Kelly, and then that McCleod-Cato would "take care of it" (Compl. ¶ 19), after which Plaintiff again met with Kelly to discuss "the spending issues involving Head Start funds" (*id.* at ¶ 20).[5]  Based on these allegations, it is evident that Plaintiff did not merely "inform[] a supervisor of a problem," but rather took "additional steps."  *See United States ex rel. Sarafoglou* v. *Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006).[6]  Similar

---

[5]     While Plaintiff alleges that she told McCleod-Cato in this conversation that "we have to take steps to pass federal regulations" (Compl. ¶ 19), the Court disagrees with Defendant that this exchange necessarily negates Plaintiff's other conduct indicating that she held concerns about Defendant's potential fraud.  In particular, as discussed above, Plaintiff recounts two separate meetings with Kelly convened to discuss Defendant's "misappropriation and misuse of certain funds" and "spending issues involving Head Start funds."  (*Id.* at ¶¶ 17, 20).

[6]     Plaintiff also alleges that following her conversations with Kelly, and upon learning that Defendant had continued its practice of backdating receipts, she submitted a written complaint to Head Start detailing the findings of her investigation.  (Compl. ¶ 23).

"confrontations" with defendants have been deemed sufficient to establish that a plaintiff has engaged in protected conduct. *See Garcia*, 2011 WL 1458155, at *4 (collecting cases); *see also United States ex rel. Scharff* v. *Camelot Counseling*, No. 13 Civ. 3791 (PKC), 2016 WL 5416494, at *10 (S.D.N.Y. Sept. 28, 2016) (finding that plaintiff engaged in protected conduct when he informed his supervisors and others that he had discovered "examples of false information submitted to Medicaid for reimbursement" and "had previously raised his concerns with supervisors and with [defendant's] compliance officer, and advised him that he believed [defendant] was not complying with Medicaid regulations"). While Defendant contends that Plaintiff's allegations are similar to those deemed insufficient in *Johnson* v. *University of Rochester Medical Center*, in that decision "plaintiffs' complaints appear[ed] to have been primarily motivated by frustration with [physicians] who were ignoring their responsibilities … and moral objections to falsifying patient paperwork, rather than by a desire to expose or investigate Medicare/Medicaid fraud." 686 F. Supp. 2d 259, 269 (W.D.N.Y. 2010). In contrast, here there is no indication that Plaintiff harbored any such personal motivations.

---

Defendant does not attempt to argue that Plaintiff's letter to Head Start did not constitute protected activity, but rather, asserts that Plaintiff has failed to allege that Defendant had any notice of Plaintiff's communications with Head Start. (*See* Def. Br. 14-15; Def. Reply 6-7). For the reasons discussed in this section, Plaintiff's allegations regarding her internal reporting suffice to establish that she engaged in protected activity. Moreover, as the Court will discuss further when it turns to the next stage of the analysis, it finds that Plaintiff has sufficiently pleaded that Defendant had knowledge of her internal complaints.

*Second*, Plaintiff has plausibly alleged a good faith or objectively reasonable basis for believing that she was investigating matters in support of a viable FCA case.  Defendant argues conclusorily that no reasonable person would believe that the Head Start summer programming charges constituted fraud under the FCA.  (Def. Br. 11-12).  Even were the Court to accept this argument on its face, Plaintiff has nonetheless alleged protected activity premised upon her investigation and reporting of Defendant's receipt backdating.  *Cf. Fisch*, 2012 WL 4049959, at *5 (finding that plaintiff plausibly alleged that he gathered facts and information about defendant's conduct that "reasonably could have led to a viable FCA action," where he alleged that he uncovered "widespread accounting irregularities," including the "backdating of certain approved purchase orders and invoices").  The Court is also persuaded that Plaintiff could have reasonably believed that Defendant's practice of charging students who participated in the Head Start program was fraudulent, as Defendant was allegedly accepting federal funds on the condition that the program would be free of charge, and then proceeding to charge students for participating in the program.  *Cf. United States* v. *Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 622 (S.D.N.Y. 2013) ("'[A]n improper claim' [under the FCA] is any claim 'aimed at extracting money the government otherwise would not have paid.'" (quoting *Mikes* v. *Strauss,* 274 F.3d 687, 696 (2d Cir. 2001))); *Kall* v. *Peekskill City Sch. Dist.*, No. 18 Civ. 10199 (NSR), 2020 WL 2555256, at *6 (S.D.N.Y. May 19, 2020) (finding that plaintiff had sufficiently pleaded protected activity where she alleged that she "believed" defendant had engaged

15

in "the unlawful stealing of public funding, fraud, public corruption, and/or misuse of public funds").  While further illumination on Defendant's practices and exchanges with Head Start may impact the Court's ultimate disposition of this case, at this stage in the proceeding, the Court accepts that Plaintiff has made a sufficient showing as to her "good faith" or "objectively reasonable" belief.  *See Swanson*, 2016 WL 3198309, at \*4-5 ("absent clarification" on defendant's internal guidelines and state and federal rules regarding the disbursal of funds, the district court could not determine whether plaintiff had failed to allege a "predicate violation" of the New York False Claims Act, "particularly because [plaintiff] need only 'show a good faith basis, or objectively reasonable basis, for believing that he … was investigating matters in support of a viable FCA case'" (internal quotation marks omitted) (quoting *Sasaki*, 2012 WL 220219, at \*12)); *cf. id.* at \*4 ("[T]he line between 'merely' policing regulatory compliance, on the one hand, and investigating fraud, on the other, can be a hazy one — and the inquiry is fact specific." (alteration in *Swanson*) (quoting *Pitts* v. *Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015))).

*Third*, the Court disagrees with Defendant that Plaintiff's allegations of "fraudulent and wasteful" spending are conclusory and insufficiently pleaded. (*See* Def. Br. 12-14).  Defendant argues that Plaintiff has failed to explain how Defendant's spending on children's supplies was "fraudulent" or "wasteful." (*Id.* at 13).  However, Plaintiff alleges that Defendant was "fraudulently backdating receipts of purchases for children's supplies … in order to fully

expend [its] current budget with Head Start" (Compl. ¶ 14), and that it engaged in this conduct so as to "prevent Head Start from decreasing [its] budget for the next fiscal year, as the budget would be based on the previous year's spending" (*id.* at ¶ 15).  Given the factual support Plaintiff has proffered, the Court finds such allegations to be neither conclusory nor insufficiently pleaded.  *See Fisch*, 2012 WL 4049959, at *5 (finding that plaintiff plausibly alleged protected conduct where he claimed that he investigated "a variety of financial improprieties," including backdating of certain purchase orders and invoices); *cf. Adiram* v. *Cath. Guardian Servs.*, No. 13 Civ. 6235 (SLT) (JO), 2015 WL 5706935, at *5 (E.D.N.Y. Sept. 28, 2015) (deeming allegations conclusory where plaintiffs "provide[d] no details regarding the alleged fraud").

In sum, the Court finds that Plaintiff has plausibly alleged that she engaged in protected activity.  It will next address Defendant's arguments that it had insufficient knowledge of this protected conduct.

## 2. Plaintiff Has Alleged Defendant's Knowledge of Her Protected Activity

As noted, to satisfy the second element of an FCA retaliation claim, Plaintiff must sufficiently plead that Defendant knew that she was engaging in protected activity.  *Chorches*, 865 F.3d at 95.  "Absent such notice, then *a fortiori*, [Defendant's] actions could not constitute retaliation."  *Faldetta*, 2000 WL 1682759, at *13 (citation and internal quotation marks omitted).  The standard for notice is "flexible" — "the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged."  *Lawrence*, 2017 WL 3278917, at *7 (internal quotation marks omitted) (quoting

*United States ex rel. Williams* v. *Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260
(D.C. Cir. 2004)).

In analyzing this element, many courts have applied a "heightened
standard" of notice, requiring that "plaintiffs alleging that performance of their
normal job responsibilities constitutes protected activity must 'overcome the
presumption that they are merely acting in accordance with their employment
obligations' to put their employers on notice."  *Swanson*, 2016 WL 3198309, at
*5 (quoting *Williams*, 389 F.3d at 1261) (collecting cases).  More recently,
however, some courts have considered whether this heightened standard
survived the 2009 amendments to the FCA, as

> the decisions propounding the heightened standard
> "were concerned with ensuring that the employer was
> on notice of an employee's intentions of *bringing or
> assisting in an FCA action*," while the 2009 amendments
> broadened the scope of the FCA's whistleblower
> provision to protect against retaliation in cases where
> "the employee was engaged *in efforts to stop an FCA
> violation*, even if the employee's actions were not
> necessarily in furtherance of an FCA claim."

*Id.* at *5 (emphasis in *Swanson*) (quoting *Malanga I*, 2015 WL 7019819, at *3).
These courts have expressed concern that "holding fraud-alert employees to a
higher notice standard would essentially impose a hardship on a class of
plaintiffs who were subject to retaliation simply because they were doing their
job," and have found that such employees' internal reports of fraud are
sufficient to put an employer on notice.  *See Malanga* v. *N.Y. Univ.*, No. 14 Civ.
9681 (WHP), 2018 WL 333831, at *2 (S.D.N.Y. Jan. 9, 2018) ("*Malanga II*")
(collecting cases).  Other courts have continued requiring plaintiffs to meet the

18

heightened notice standard.  *See, e.g.*, *Ortiz*, 2019 WL 1207856, at *5 (reasoning that "[o]therwise, the FCA retaliation provision would confer virtual immunity on an auditor for a government contractor from discipline or termination related to his work, because all his work would be 'protected activity'"); *see also Khurana*, 2021 WL 50890, at *17; *Lawrence*, 2017 WL 3278917, at *7.

Unsurprisingly, the parties disagree as to whether the heightened standard for notice survived the 2009 amendments to the FCA.  (*See* Pl. Opp. 12-13; Def. Reply 4-5).[7]  However, even were the Court to apply this standard, it is unable to "discern from the allegations in the Complaint whether [Plaintiff's] actions were wholly 'within [her] responsibilities' or involved reporting 'outside the usual chain of command.'"  *Swanson*, 2016 WL 3198309, at *6; *see also N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 300 ("Irrespective of the standard for notice, however, the Court cannot conclude from the allegations in the Amended Complaint that the protected conduct [plaintiffs] engaged in was, in fact, within their employment responsibilities, instead of requiring them to act beyond those responsibilities or to report beyond their usual chain of command.").

---

[7]     Plaintiff makes the additional argument that the heightened notice requirement is reserved for "so-called fraud alert employees" (Pl. Opp. 12 (citing *Malanga* v. *N.Y. Univ. Langone Med. Ctr.*, No. 14 Civ. 9681 (WHP), 2015 WL 7019819, at *3 (S.D.N.Y. Nov. 12, 2015))), and is thus not applicable to her, as her position did not involve "the traditional role of auditor or investigator" (*id.*).  For the reasons discussed above, the Court is unable to determine whether Plaintiff qualified as a "fraud alert employee" at this stage of the litigation.  *See Malanga I*, 2015 WL 7019819, at *3.

Defendant argues that: (i) Plaintiff's position involved "reviewing the files, records, and reports of subordinates, and detecting for issues in those documents" (Def. Reply 4);[8] (ii) Plaintiff discovered the allegedly fraudulent conduct "while performing her job duties" (*id.* at 6 (quoting Compl. ¶ 13)); and (iii) Plaintiff reported the issues up the "chain of command" (*id.*). From this, Defendant concludes that Plaintiff's internal reporting fell within her work responsibilities and was insufficient to provide notice. (*Id.*). However, the Court cannot extrapolate merely from the allegation that Plaintiff's responsibilities included reviewing her supervisees' files and submitting reports the conclusion that her investigation and reporting of Defendant's allegedly fraudulent purchases and practice of charging for the Head Start summer program fell entirely within the bounds of her job responsibilities. (*See* Compl. ¶ 12). In particular, Plaintiff's allegation that McCleod-Cato told her that "complaining" to Kelly "was a mistake" because Plaintiff had "no authority" to do so indicates that Plaintiff's reporting went beyond her duties and circumvented Defendant's chain of command. (*Id.* at ¶ 21). *See Mikes* v. *Strauss*, 889 F. Supp. 746, 753-54 (S.D.N.Y. 1995) (finding that "defendants

---

8  In contrast, Plaintiff alleges that her job responsibilities included:

> [H]iring, training, and coaching Family Services Coordinators ("FSCs") in the Head Start Family Service model and program requirements, ensuring that FSCs maintained organized family files and other records, reviewing and tracking individualized Family Partnership Agreements, monitoring files and workload of the FSCs, submitting accurate and timely reports as required, and visiting early childhood education centers on a regularly scheduled basis.

(Compl. ¶ 12).

had reason to believe that plaintiff was investigating their alleged fraudulent billing practices" based in part on defendants' "alleged enraged reaction to plaintiff's unauthorized inspections"); *cf. United States ex rel. Yesudian* v. *Howard Univ.*, 153 F.3d 731, 745 (D.C. Cir. 1998) (concluding that plaintiff's investigation and complaints "could not have been mistaken for routine actions in accordance with his employment obligations" where "the trial record indicate[d] that [plaintiff's] supervisors knew of and were distressed by his whistleblowing activities"). Accepting Plaintiff's allegations as true, the Court is unable to determine that her responsibilities included the protected activity alleged in the Complaint. *See Swanson*, 2016 WL 3198309, at *6 ("These open questions require factual development and render dismissal inappropriate at this stage." (collecting cases)).[9]

Plaintiff has adequately alleged that Defendant had notice of her protected activity. Plaintiff was persistent in her internal reporting of the alleged violations. She met twice with Kelly to discuss the issues she had identified, and subsequently learned that Kelly had in turn informed McCleod-Cato about her complaints. (Compl. ¶¶ 17-21). *See Sarafoglou*, 451 F. Supp.

---

[9]     The Court is unpersuaded by the cases cited by Defendant in support of its argument that this issue can be decided at the motion to dismiss stage (Def. Reply 5), as in those cases plaintiffs put forth no allegations indicating that they were engaged in activity outside of their job responsibilities. *See Lawrence*, 2017 WL 3278917, at *9 (noting that plaintiff was an "internal auditor" and his reports entailed "nothing more than what he was obligated to disclose as an auditor"); *United States ex rel. Ivanov* v. *Exelis, Inc.*, 41 F. Supp. 3d 50, 54 (D.D.C. 2014) ("[W]ithout any facts showing that [plaintiff] engaged in activity outside of his normal job responsibilities, [defendant] could not have been on notice that he was engaged in protected activity."); *cf. Faldetta*, 2000 WL 1682759, at *1, 12 (determining on summary judgment that a quality assurance section manager engaged in conduct that fell within his duty of "overseeing the inspection process to ensure compliance with government specifications").

2d at 624-25 (deeming unconvincing defendants' argument that they lacked notice where plaintiff made multiple reports to both her supervisors and others).  Moreover, Kelly appears to have acknowledged the impropriety of Defendant's conduct, given that he allegedly encouraged Plaintiff to "be a team player" and "keep things internal" during their August 2017 meeting.  (Compl. ¶ 20).  This further supports a finding that Plaintiff has sufficiently pleaded notice.  *Cf. Fisch*, 2012 WL 4049959, at *6 (determining that "a reasonable factfinder could conclude that the [defendant] was on notice of a potential FCA action" where defendant's executive director "explicitly *acknowledged* that the [defendant's] actions were improper or illegal by stating that the [defendant] was 'too small to get caught'" (emphasis in original)).

Finally, while Defendant argues that Plaintiff has failed to plead that it had any knowledge of her communications with Head Start (*see* Def. Br. 14-15), Defendant was clearly on notice of Plaintiff's internal reports months before her November 2017 letter to Head Start (*see* Compl. ¶ 23).  *Cf. Scharff*, 2016 WL 5416494, at *10 (concluding that plaintiff "plausibly alleged" that his supervisors were aware of his protected conduct where his complaint alleged that he informed his supervisors and others "of his belief that they had submitted false claims for Medicaid reimbursement").  The Court thus concludes that Plaintiff has satisfied this element of her FCA retaliation claim.

### 3.    Plaintiff Has Alleged Retaliatory Action

Lastly, Plaintiff must show that Defendant took "adverse action" against her "because of" her protected activity.  *Chorches*, 865 F.3d at 95.  While the

22

Second Circuit has not addressed the appropriate causation standard for FCA retaliation claims, *see Kall*, 2020 WL 2555256, at *6 n.9, a number of courts in this District have employed a "but-for" causation standard, rather than the "less-stringent 'motivating factor' standard," *see id.*; *see also Malanga II*, 2018 WL 333831, at *4 ("[T]his Court joins the chorus of courts recognizing a 'but-for' causation standard under the FCA."); *Lawrence*, 2017 WL 3278917, at *7 ("[T]he Supreme Court has clarified that the term 'because of' typically 'imports, at a minimum, the traditional standard of but-for causation.'" (quoting *EEOC* v. *Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015))).

"[T]emporal proximity can support an inference of retaliation for purposes of establishing a *prima facie* case of retaliation, but the proximity must be 'very close.'" *O'Toole*, 2020 WL 2512099, at *12 (alteration in *O'Toole*) (quoting *Dhar* v. *City of New York*, 655 F. App'x 864, 865-66 (2d Cir. 2016) (summary order) (quotation marks omitted)). That said, there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the protected conduct and allegedly retaliatory action." *Alvarado* v. *Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 785 (S.D.N.Y. 2019) (internal quotation marks omitted) (quoting *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013)). While "a seven-month gap between the protected conduct and retaliatory action may be 'on its own ... too attenuated to give rise to an inference of but-for causation,' courts have also concluded that gaps of seven and eight months may support a sufficient temporal connection if accompanied by other indicia of retaliatory

23

motive." *Id.* (ellipses in *Alvarado*) (internal citation omitted) (quoting *Avillan* v. *Brennan*, No. 16 Civ. 5611 (AJN) (RLE), 2018 WL 4680027, at *5 (S.D.N.Y. Sept. 28, 2018)).  Notwithstanding, "[w]hen an employer produces sufficient evidence to show a legitimate reason for a plaintiff's termination, there is no causal connection between allegedly protected activities and termination." *Sasaki*, 2012 WL 220219, at *13 (internal quotation marks omitted) (quoting *Liburd* v. *Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *11 (S.D.N.Y. Apr. 3, 2009)).

Defendant argues that the temporal relationship between Plaintiff's internal reporting and termination is too attenuated to establish that she was terminated in retaliation for any protected activity.  (Def. Br. 16).  Plaintiff rejoins that the delay was, at most, seven to nine months, and thus her retaliation was sufficiently temporally proximate to permit the inference of but-for causation.  (Pl. Opp. 21).  Separately, Defendant argues that Plaintiff's allegations themselves demonstrate that she was fired for cause, specifically due to her "serious misconduct" at the December 2017 conference, and that Plaintiff failed to plead that the proffered grounds for her termination were false or pretextual.  (Def. Br. 17-19 (quoting Compl. ¶ 27)).  In response, Plaintiff maintains that she has adequately pleaded that Defendant's basis for termination was pretextual, as she has alleged "that [Defendant] asserted that Plaintiff had violated a non-existent policy, falsely accused her of submitting improper expense reimbursements, and did not discipline Plaintiff's colleague

who was actually responsible for the parent's participation — not Plaintiff — in the conference." (Pl. Opp. 22-23).[10]

While the Court agrees with Defendant that, in isolation, the nine-month gap between Plaintiff's initial internal report and her termination would not permit the inference of retaliation, this gap in conjunction with Plaintiff's other allegations allows the Court to infer that she was fired "because of" her protected activity.[11]  Although Plaintiff first met with Kelly to raise concerns about Defendant's potentially fraudulent conduct in May 2017, she spoke with him again in August 2017 to "further discuss[] the spending issues involving Head Start funds." (Compl. ¶¶ 17, 20).  As Plaintiff was terminated in February 2018 (*id.* at ¶ 27), the Court agrees with Plaintiff that the relevant gap between her protected activity and termination is properly understood as spanning approximately seven months (*see* Pl. Opp. 21).  A seven-month gap is itself "not

---

[10]     In her opposition brief, Plaintiff argues that the Court should apply the burden-shifting framework adopted in *McDonnell Douglas* in analyzing the causation element, noting that "the Second Circuit has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims." (Pl. Opp. 20 (quoting *Plotzker* v. *Kips Bay Endoscopy Ctr., LLC*, No. 12 Civ. 9255 (GBD), 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017), *aff'd sub nom. Plotzker* v. *Kips Bay Anesthesia, P.C.*, 745 F. App'x 436 (2d Cir. 2018) (summary order))).  In its reply brief, Defendant does not respond to this argument, or to any of Plaintiff's other arguments regarding causation. (*See* Def. Reply).  At the motion to dismiss stage, only the first step of the *McDonnell Douglas* framework — the plaintiff's burden to allege a *prima facie* case of discrimination — is at issue.  *See Littlejohn*, 795 F.3d at 311.  While the Court is unaware of any courts in this Circuit that have applied the *McDonnell Douglas* framework in considering FCA retaliation claims at the motion to dismiss stage, for the reasons discussed therein, it finds that Plaintiff has alleged a *prima facie* case of retaliation.  And with respect to causation, after consulting other relevant decisions that have considered FCA retaliation claims at the motion to dismiss stage, it finds that Plaintiff has sufficiently pleaded this element.

[11]     Defendant asserts that the relevant gap was ten months, but the Court agrees with Plaintiff that approximately nine months elapsed between her May 2017 meeting with Kelly and her February 2018 termination.  (*See* Compl. ¶¶ 17, 27).

prohibitively remote" and "within the temporal range that [the Second Circuit has] found sufficient to raise an inference of causation." *Summa*, 708 F.3d at 128; *cf. Garcia* v. *Yonkers Bd. of Educ.*, No. 15 Civ. 767 (NSR), 2018 WL 4007648, at *6 (S.D.N.Y. Aug. 21, 2018) ("[A]t times the Circuit has found three months to be insufficient, but eight months indicative of a causal connection." (citations omitted)), *aff'd*, 803 F. App'x 441 (2d Cir. 2020) (summary order).

Moreover, "the other surrounding circumstances," support the inference of causation. *Summa*, 708 F.3d at 128. In particular, Plaintiff has alleged that her relationship with McCleod-Cato "deteriorated" following her meetings with Kelly (Compl. ¶ 21), and that Kelly failed to "take any steps to curtail McCleod-Cate's conduct or prevent her from retaliating against Plaintiff" (*id.* at ¶ 22). Plaintiff alleges that in a weekly leadership meeting in or around June 2017, she learned that McCleod-Cato had been informed of her first meeting with Kelly. (*Id.* at ¶ 19). During the meeting, McCleod-Cato stated: "I know that you spoke to … Kelly about the violations, but he told me that nothing was going to be done." (*Id.*). Following Plaintiff's second meeting with Kelly in August 2017, McCleod-Cato "openly criticized" her, "acted cold and hostile towards" her, and told Plaintiff she had "no authority" to complain to Kelly. (*Id.* at ¶ 21). In September 2017, Plaintiff met with Kelly "to address McCleod-Cato's sudden hostility towards her and to express her concern that she was being retaliated against for her previous reporting of the incidents." (*Id.*). However, Kelly merely encouraged Plaintiff "to try other ways of working with the situation and dealing with McCleod-Cato," and failed to intervene to address McCleod-Cato's

26

alleged retaliation.  (*Id.* at ¶ 22).  Approximately five months later, Plaintiff's employment was terminated by McCleod-Cato for "abundantly false" reasons. (*Id.* at ¶¶ 27, 30).  This alleged hostile behavior towards Plaintiff, coupled with her protected conduct's "reasonably close temporal proximity" to her termination, permits the Court to infer at this stage that Plaintiff's employment was terminated in retaliation for her protected activity.  *See Summa*, 708 F.3d at 128 ("[T]he combination of reasonably close temporal proximity and the particular context in this case is sufficient to infer causation[.]"); *Alvarado*, 404 F. Supp. 3d at 785-86 (concluding that plaintiff had sufficiently established but-for causation where she alleged an eight-month gap between her complaint and defendant's retaliatory action, plus "a pattern of conduct and relationships that indirectly support an underlying retaliatory motivation").

Defendant's argument that Plaintiff has failed to plead that its "grounds for terminating [her] were false or pretextual" is unavailing.  (Def. Br. 18-19). In support, Defendant refers the Court to *Lawrence*, where the district court determined that "conclusory assertion[s] that [defendant's] reason for terminating [plaintiff's] employment was 'false' and a 'pretext for unlawful retaliation' are entitled to no deference on a motion to dismiss."  2017 WL 3278917, at *8.  However, in contrast to the plaintiff in *Lawrence*, Plaintiff here has alleged far more than mere conclusory assertions.  The Complaint alleges that Plaintiff was ostensibly terminated for conduct that occurred in connection with a December 2017 conference — specifically, "mishandling [Defendant's] funds" by allegedly "treating" a student's parent to dinner and "falsifying car

27

service receipts" that Plaintiff either submitted or assisted the parent in submitting. (Compl. ¶¶ 24-29). It further alleges that the "stated reasons" for Plaintiff's termination were "abundantly false," as: (i) Defendant never provided any policies or guidelines related to food or transportation expenses during the conference; (ii) the parent attending the conference submitted her receipts to Defendant, and Plaintiff was unaware of the contents of the receipts; (iii) Plaintiff was not responsible for the parent's attendance at the conference; and (iv) the employee responsible for the parent's attendance at the conference was never disciplined. (*Id.* at ¶¶ 26, 30-31). Construing these allegations liberally and accepting the well-pleaded facts as true, Plaintiff has satisfactorily pleaded that Defendant's bases for her dismissal were pretextual. *See Kall*, 2020 WL 2555256, at *7 (accepting plaintiff's allegations that defendant's professed reasons for her dismissal were pretextual).

In sum, the Court finds that Plaintiff has alleged a viable retaliation claim under the FCA, and therefore denies Defendant's motion to dismiss.

**CONCLUSION**

For the reasons set forth in this Opinion, Defendant's motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motions at docket entries 17 and 25. Defendant is hereby ORDERED to file a responsive pleading on or before August 10, 2021. Further, on or before August 17, 2021, the parties are ORDERED to submit a joint status letter and a proposed Civil Case Management Plan.

SO ORDERED.

Dated:   July 20, 2021
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

29